IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LADELL MADLOCK,

                      Plaintiff,

    v.                                                                             OPINION and ORDER

ROBERT SHANNON, DYLAN BAUSCH,                            19-cv-410-jdp
and PENNY SKAIFE,

                      Defendants.

---

      Pro se plaintiff Ladell Madlock says that when he was incarcerated at Wisconsin Secure Program Facility (WSPF), defendants allowed him to keep medication in his cell that he took in an attempt to harm himself. He says that defendants knew that he wasn't allowed to possess the medication because he was at risk of self-harm. After screening his complaint, I gave him leave to proceed on claims against defendants under the Eighth Amendment to the United States Constitution and Wisconsin negligence law. Dkt. 12.

      Defendants move for summary judgment. Dkt. 50; Dkt. 58. Madlock has failed to identify any evidence that he was actually injured in his self-harm attempt, so I will grant both motions, dismiss Madlock's claims, and close this case.

### UNDISPUTED FACTS

      The following facts are undisputed except where noted.[1] I'll view any disputed facts in the light favorable to Madlock.

---

[1] Madlock objects to several of Shannon and Bausch's proposed facts solely on the ground that he was not present to observe them. *See, e.g.*, Dkt. 65, ¶ 9. This is not a valid objection; objections must be based on evidence in the record. I deem any fact that is objected to solely

In February 2019, Ladell Madlock was housed in WSPF's general-population unit, known as Charlie unit. At WSPF, certain medications are known as "Keep on Person" or "KOP" medications, meaning that inmates may keep those medications with them. KOP medications are usually over-the-counter medications. At that time, Madlock was on what's known as a "No Keep on Person" or a "No KOP" restriction, meaning that he was not allowed to keep KOP medications with him.

On February 24, 2019, Madlock went to WSPF's Health Services Unit (HSU), where he was assessed for chest pains by defendant Penny Skaife, a contract nurse. Madlock had been taking Tylenol for chest pain but he had used all the Tylenol in his prescription. Madlock didn't have this Tylenol in his cell; it had been in a blister pack kept on the medication cart from which correctional officers dispense inmate medications.

Skaife told Madlock that she would renew his Tylenol prescription. Madlock told Skaife not to send the Tylenol directly to him because he was on a No KOP restriction as a suicidal inmate. Skaife explained that she wasn't sending the Tylenol directly to Madlock but would have it placed on the medication cart to be dispensed to Madlock by a correctional officer.

Two days later, Bausch brought a bottle of Tylenol to Madlock's cell. Bausch passed the bottle to Madlock through the trap in his cell door. Madlock says that he told Bausch that he was on a No KOP restriction because he was suicidal. He also says that he tried to hand the bottle back to Bausch, who refused to take it. (According to Bausch, Madlock took the medication without saying anything.)

---

on this basis to be undisputed.

Shortly after Bausch left his cell, Madlock heard defendant Correctional Officer Robert Shannon in the hallway near his cell. Madlock says that he shouted, "CO Shannon, I'm suicidal and I have pills I'm not supposed to have." Dkt. 67, ¶ 8. (Shannon says that he didn't hear Madlock shouting at him.)

About half an hour later, Shannon brought a snack bag to Madlock's cell. According to Madlock, he showed Shannon the bottle of Tylenol and said that he was suicidal, to which Madlock replied, "I don't care. Kill yourself. You're an idiot." *Id.*, ¶ 10. Madlock began swallowing the pills, swallowing 50 in total. (According to Shannon, Madlock briefly showed him a handful of about 10 to 15 pills, then put them in his mouth within a few seconds.)

Shannon left Madlock's cell to tell the unit sergeant what had happened. The unit sergeant then called the captain on duty. Bausch was also in the area, and the sergeant told him to go to Madlock's cell to observe him until the supervising officer arrived, which Bausch did.

A captain arrived at Madlock's cell, and the staff decided to send Madlock to a local emergency department for evaluation and care. Madlock says that after arriving at the emergency room, he vomited into a paper bag that a nurse gave him. Dkt. 67, ¶ 15. (Defendants cite a medical record that states that Madlock was "[n]egative" for vomiting. Dkt. 55-1, at 52.) It's undisputed that Madlock reported no shortness of breath, abdominal pain, nausea, or headache; that he was oriented to person, place, and time; that he was not in distress; that his heart rate was normal and its rhythm was regular; and that his liver enzymes weren't elevated. *See id.* Madlock reported only that he was "feeling a little lightheaded." *Id.* at 51.

Madlock's acetaminophen level in his blood was initially measured at 52 micrograms per milliliter, but four hours later, it was measured at 20 micrograms per milliliter, within the reference range of zero to 30 micrograms per milliliter. *Id.* at 53–54. His initial testing results also showed that his levels of glucose and albumin (a protein made by the liver) were both barely above the reference ranges; the record doesn't show that these levels were measured again. *Id.* at 52. Madlock remained at the hospital until 2:00 p.m. the next day, after which he was returned to WSPF and placed on observation status. He showed no further effects from the acetaminophen.

ANALYSIS

The Eighth Amendment forbids prison officials from intentionally ignoring the risk caused by a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). To succeed on his Eighth Amendment claims, Madlock must identify evidence that defendants' actions caused him to be injured. *Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020). Likewise, to succeed on his negligence claims, Madlock must identify evidence that defendants' actions caused him "actual damage." *Hennekens v. Hoerl*, 160 Wis. 2d 144, 465 N.W.2d 812, 816 (1991). Because Madlock hasn't identified any such evidence, I don't need to consider defendants' other arguments for why they are entitled to summary judgment.

Madlock doesn't allege that he suffered any lasting harm from his overdose attempt, and the only symptoms that he reported at the time—a single incident of vomiting and feeling "a little lightheaded"—don't rise to the level of a constitutional harm. *Lord*, 952 F.3d at 905 ("minor" physical injuries are insufficient to support Eighth Amendment claim); *see also Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010) ("Vomiting, in and of itself, is not an uncommon

4

result of being mildly ill, and, absent other circumstances . . . does not amount to an objectively serious medical condition.").

Madlock contends that his lab results showing elevated levels of acetaminophen, glucose, and albumin show that he was injured. But he hasn't identified any evidence that the temporary, modest elevations shown in these results caused any injury or even posed any risk of injury. There's no indication from Madlock's medical records that any of his medical providers thought that his test results warranted further treatment. After his acetaminophen level had fallen to within the reference range, Madlock was discharged back to WSPF with no specific instructions other than that he should have a follow-up visit the next day. Dkt. 55-1, at 54. It's unclear from Madlock's records whether he scheduled a follow-up visit, but he identifies nothing in his records showing that his overdose attempt caused him any harm. Accordingly, Shannon, Bausch, and Skaife are entitled to summary judgment on Madlock's claims.

## ORDER

IT IS ORDERED that:

1. Defendants Robert Shannon and Dylan Bausch's motion for summary judgment, Dkt. 50, is GRANTED.

2. Defendant Penny Skaife's motion for summary judgment, Dkt. 58, is GRANTED.

3. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered March 15, 2021.

                              BY THE COURT:

                              /s/

                              _____

                              JAMES D. PETERSON
                              District Judge